Eric MacArthur for the petitioners, and I would like to request two minutes for rebuttal. You may. The district court clearly abused its discretion in authorizing discovery outside the administrative record in this APA case and then compounded that error by ordering the deposition of Acting Assistant Attorney General Gore. Although the Gore deposition is what precipitated the government's mandamus petition, I would like to begin with the threshold issue of extra record discovery. It is black-letter administrative law that APA review is confined to the administrative record, that where the agency has issued a contemporaneous explanation for its decision, the decision must rise or fall on the basis of that explanation, and that courts should not probe the mental processes of agency decision-makers. But what if there's reason to believe that there are other considerations that the agency hasn't put forth? So the narrow exception that courts have recognized, the principles that I just outlined, is where the plaintiff makes a strong showing of bad faith or improper behavior. You don't think the showing with regard to Mr. Ross's memorandum of early 2017 raises that? That is correct, Your Honor. Why is that? Why the supplemental memorandum? Why isn't his memo enough? The supplemental memorandum does not, in our view, create any issue of bad faith. At most, the supplemental memorandum shows that Secretary Ross had reached a preliminary view that this data could be useful in enforcing the Voting Rights Act and wanted to know whether it was. He gave a different explanation to Congress, however, when he testified before the hearing on why he was ordering this addition to the census. In the Title VII cases, that looks very much like pretext when you change your reason for doing something. Your Honor, I respectfully but strongly disagree with the assertion that Secretary Ross has changed his explanation. I'm aware of the testimony that Secretary Ross gave to Congress, and I would be happy to address each of the three instances that has been cited. In none of those three instances do I think it is fair to say that Secretary Ross was misrepresenting the record to Congress. And I think the key contextual issue there is that in none of those cases were the questions focused on who, as between the Department of Justice and the Department of Commerce, initiated this discussion. The questions were not anywhere near that neighborhood. And I think if you look at those transcripts in context, you'll see that those statements are rather easily explained. The DOJ memo was December of 2017, right? That is correct, Your Honor. Is there anything in the administrative record that reflects communications between the Department of Commerce and DOJ prior to that? Yes, Your Honor, there is. And what are the dates of those communications? I don't have the precise dates at my fingertips, but there are a number of communications that are reflected in September, November. I apologize. I didn't mean to interrupt you. Go ahead. No, go ahead, Your Honor. Are there any that predate Secretary Ross's memorandum of February 2017? Secretary Ross's memorandum of February? Well, his statement of 2017, which becomes the focus of the request for the extra record discovery. I am not aware of that, Your Honor. But didn't Secretary Ross tell the Congress that he wanted to include the citizenship question to help enforce Title II of the Voting Rights Act? Isn't that the reason he gave, to enforce the Voting Rights Act? Yes, and that is the reason that he gave in his memorandum as well. There has been no shift in that explanation. The only confusion I think as between the original memorandum and the supplemental memorandum has to do with whether there were discussions between the agencies that preceded the memorandum. The plaintiffs have tried to make out a case that the original memorandum was misleading because it began its recitation of the procedural history with the Department of Justice's formal letter requesting the reinstatement of the question. But that argument has no merit whatsoever. I think we need to be very clear about what Secretary Ross's original memo did and did not say. It did not say that he had never considered adding a citizenship question before he received the Department of Justice's letter, and it did not say that there had been no communications between the agencies prior to that formal request. What is more, it is not reasonable to draw those inferences from what the memo did say. Can you say that all this is so absolutely clear that the extraordinary remedy of mandamus, which applies only to an official's refusal to do his duty, applies here? We do think that mandamus is warranted here for a number of reasons, including that the district court No reasonable argument can be made otherwise than as you were saying? I don't think the mandamus standard requires that no reasonable argument can be made otherwise. It has to be a clear case of an official refusing to do his duty. It has to be a clear case of indisputable error, and this Court has outlined a number of circumstances that could meet that requirement. It could be where the district court bases its decision on an erroneous view of the law. It could be where the district court reaches an erroneous finding of fact or where the district court reaches a decision outside the range of permissible decisions, and we think that the district court did all three of those things here. So there is one. Counsel, I'm concerned that the scientific staff of the Department of the Census Bureau seem to argue that adding this question would depress turnout, not increase it, and so that's sort of you wonder why it would help with enforcement of the Voting Rights Act, if it would depress turnout rather than increase it. Can you speak to that? That is the issue that Secretary Ross addressed head-on in his original memorandum, and he reevaluated the basis for believing that that would happen and found that there was not significant empirical support for that. Now, that's an issue that the plaintiffs can test on the merits. Absolutely, they can test that against the APA's standards for reasoned decision-making, but that is not a basis for finding bad faith here. That is one of the factors that the district court cited here was that Secretary Ross had overruled career staff, but the district court committed clear legal error in treating that as an indicium of bad faith. The Supreme Court in Wisconsin v. City of New York expressly said the mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision, and that is particularly true here because Secretary Ross explained why he disagreed with the recommendations of career staff and because the ultimate issue is one of policy, whether the benefits of reinstating this question outweigh the potential costs. And as the Supreme Court explained in Wisconsin, it is the Secretary, not the career staff, to whom Congress has delegated its constitutional authority to make those policy choices. There are a couple of overarching points that I would like to make here that frame this entire discussion separate and apart from the four specific factors that the district court relied upon in finding bad faith. And the first concerns the lens through which the Secretary's actions should be viewed here. The district court appears to have accepted plaintiff's invitation to view the Secretary's actions in the worst possible light. The district court even said that it accepted as true plaintiff's allegations for purposes of the bad faith inquiry. That approach is deeply misguided. This is not a motion to dismiss where we take the plaintiff's allegations as true and draw all inferences in the plaintiff's favor. The applicable presumptions and principles here all run in precisely the opposite direction for at least three reasons. The presumption of regularity requires courts to presume that executive officers act in good faith. Principles of interbranch comedy counsel caution before imputing bad faith to an officer of a coordinate branch. And that principle should apply with special force here where we are talking about a Senate-confirmed constitutional officer at the cabinet level. But the district court explained why he found bad faith. He gave all the reasons why he didn't feel that he had to accord a presumption of regularity to the commissioner. He did. And I would be happy to address each of the factors that he relied upon. But I do think at the threshold it's important to understand that he didn't hold their feet to the fire in the way that he was supposed to. But this is a discovery issue, and so we're talking about what's allowed to be looked at, not ultimately what's determinative. And so why is it that he has to have a mini-trial and make specific findings of bad faith as opposed to kind of that there's sufficient showing here of bad faith for me to go ahead and allow additional discovery to go forward? I mean, you're talking about this is a discovery matter. This is not merits matter. It is a discovery matter, but the applicable standard is that the plaintiff must come forward with a strong showing, not simply an allegation that passes a bare minimum threshold of plausibility, but a strong showing of bad faith or improper behavior. And the district court did not do that here. The district court did not give the secretary the benefit of the doubt, as the legal context here requires for the reasons that I've just explained. If there are plausible innocent interpretations of what the secretary did here, and there are for everything they have pointed to, the secretary gets the benefit of that doubt in this context. It's clear here we're talking about the deposition, Mr. Gore, and not the secretary himself. That's another matter. That order came after this application. I presume there's another one in the works. Is that the case? Your Honor, the decision on review of that is above my pay grade, but that is under evaluation at this time. The longer you wait, the clock's ticking. You waited two weeks on this application, didn't you? It was about two and a half weeks, Your Honor. Your points claim that you waited too long. There is a concern as to timeliness of an application, and mandamus isn't there. Doesn't that undercut your argument of the severity and the necessity of this? I don't think it does here, Your Honor. The decision to seek mandamus from this Court is a weighty one. It is not one that the Department takes lightly. It is one that requires high-level approval within the Department.  There is a second overarching factor that I wanted to discuss, which is that Secretary Ross, or the district court, never found that Secretary Ross did not actually believe the rationale set forth in his memorandum. But where does that test come from? Where does that test come from? I think it follows directly from the APA substantive law of what counts as bad faith or pretext. If the Secretary believed that the grounds cited in his memorandum justified the decision taken, there is no basis for finding that he acted in bad faith. It is not improper or uncommon for an agency head to have a favored outcome before full deliberation and final decision on an issue or to consult with his staff or other officials within the government about possible legal and factual justifications for that preferred outcome. And there is no bad faith when the decision-maker believes the rationale on which he ultimately chooses to rest the agency's decision, even if he was inclined in the first instance. But isn't there bad faith when he says he relied on something and he made his decision before he relied on that very thing? He said he relied on the opinion of DOJ, but he had that opinion before he even got the opinion of DOJ. Isn't that correct? It is not, Your Honor. He had a preliminary view. I think that is how this record should be fairly construed, that when he reached out to the Department of Justice, he had a preliminary view that this data could be useful for enforcing the VRA. Okay. And there's difficulty here because of the telecommunications. So tell me where in this record that preliminary view is reflected, short of Mr. Gore's statement in December of 2017. I think it's reflected in the separate. Tell me exactly where. I want to see it. I want to read it with you. Well, I think the key point is at addendum 178. 178? Addendum 178. Hang on. Addendum 178 of the government's document? I believe that this is from the government's document. This is a supplemental memorandum by the Secretary? Yes, this is Secretary Ross's supplemental memorandum, and I'm looking at the last sentence of the first paragraph. Hang on. I don't read that quickly. Well, this doesn't tell us when or what. Just because he consulted. Well, this is what the plaintiffs. He could have consulted before he signed this. This is what the plaintiffs and the district court are pointing to, to try to make this argument that somehow the story has been changed here, and it just doesn't support that. He said, as part of the deliberative process, my staff and I consulted with federal government components and inquired whether the Department of Justice would support and if so would request inclusion of a citizenship question as consistent with and useful for enforcement of the Voting Rights Act. Now, the district court looked at that sentence and said this could be read to suggest that the Secretary had already decided the issue before he reached out to DOJ. But setting aside for the moment that could be read to suggest, it's hardly the stuff of which a strong showing is made. That is simply not a fair reading of this supplemental memorandum. But I guess what I'm wondering is, is that how does the Secretary know the Department's views until Mr. Doar gives them to him? He didn't. Where in the record do we know what the Secretary knew from the Department? I mean, your argument is, is that the Secretary is allowed to gather all this stuff. I totally agree with you. I mean, I've had Secretary certification cases on HEW and in the Department of Defense matters. So I understand that, and that makes perfect sense to me. But what I'm asking you is, where in the record is anyone able to glean that the Department of Justice was consulted and during the deliberations in which the determination to ask the citizenship question was made? I don't have the exact citations at my fingertips. Well, you were going to give them to me then. Certainly, Your Honor. There were some. Because you're standing here with a courtroom full of people asserting that those things were done. But I want to know where in the record that that's there. Because I have to determine, along with my colleagues, that I always tell my law clerks mandamus is, quote, not even close, end of quote. Not even close. The facts are on the law. And we don't think this one is closer. There are documents in the record that show that the Department of Commerce and the Department of Justice discussed this issue before the Department of Justice sent its formal request letter. That is what the plaintiffs are trying to make hay out of. They think that the original memorandum, fairly read, means that the Department of Justice letter came as a bolt from the blue without these sorts of prior discussions. I've been really generous with the time, and Judge Poole is seated to me watching the clock. And I'll ask myself if they have any more questions. I don't have them. One more thing before I ask. I don't have access to the timer, so I will count on you, Judge Wesley. That's okay. I figure as long as you're asking, Judge Poole, I'm waiting. Okay? The record for review, is the Department able, in the Secretary's discretion, is the Secretary able to keep from the record of review those preliminary discussions in which the Department of Justice's views were solicited with regard to the implications of the Voting Rights Act and the ability to enforce Section 2 of the Voting Rights Act and the necessity of the citizenship question up until the time that Mr. Gore issues his memorandum? That was our position in the district court, yes, Your Honor, that those sorts of pre-decisional, deliberative discussions should not be part of the administrative record. The district court disagreed with that, and that is not the subject of our current mandamus petition. So that is water over the bridge, as we say back in Livonia. Well, it may not be water over the bridge. There may be an appropriate time for us to seek appellate review of that determination, but that's not part of our current mandamus petition. We are not here to quibble about what is and is not properly part of the administrative record. We are here about once you draw that line, can you go beyond it. You opened with what could or couldn't be considered in the administrative record, so I was wondering how far you wanted to ride there. Well, the question is whether you can go beyond the administrative record and start deposing agency officials about their mental process. Got you. Hang on just for a second. Judge Pooler, anything else? No. We'll hear from Respondents now. All right. Judge LaValle, anything else? Fair enough. Mr. Wu. May it please the Court, Stephen Wu for the government plaintiffs here. I'd like to begin with the district court's bad faith finding. I will note that we have our threshold objections to mandamus in terms of timing and waiver, but we'll rest on our briefs arguments for those points. The government dramatically understates the degree of the Secretary's shift in rationale in the issuance of the supplemental memorandum. What the Secretary's second justification revealed was that the initial rationale for adding the citizenship question concealed Commerce's direct involvement in DOJ's December 2017 letter and treated what Commerce had done as merely a response to an independent agency's sort of freestanding judgment about what data they needed from the decennial census. And what the supplemental memorandum proved was that both of those were false. This was not an independent judgment from DOJ. This was done at Commerce's request, with Commerce's direct collaboration, though the details remain uncertain, and, again, with the motivation of Commerce rather than sort of organically within the Department of Justice itself. And the reason that that matters is two things. First of all, for discovery purposes, what this shift in position shows is that the Secretary's sort of record before the court is not a reliable record in the first instance. The district court found there's a rebuttal of the presumption of regularity that attaches to the government's public justifications for its actions. And I think that's highlighted by the fact that when the government first appeared in the district court, the record they produced to the district court contained nothing preceding December 2017, as though, as the Secretary testified in Congress, they had done no deliberation on this subject before the Department of Justice letter. Now, we know that to be false with the supplemental record they have produced, and that is, again, a reason to uphold the district court's requirement of discovery. When an agency or a department begins to consider a question, lots of issues come up. Different people express different opinions. But when the agency comes to its decision, what is it we're going to do, and what is the reason we're going to do it, is it your position that the department is required to include in the record all of the preliminary discussions in which different people express different views prior to the time when the department focuses on what is its reason and what supports the decision? We think it does. I mean, the general rule for administrative record review is to include in the record everything that directly or indirectly was considered by the decisionmaker. And there's no cutoff in time for when that happens. It's everything that motivates or factors into that decision. And certainly what is telling about this case is that the justification that they relied upon, which is the Department of Justice letter, there were misrepresentations about the origins of that letter and the nature of the Secretary's response. This was, again, not a situation where Commerce only began active consideration of this question following receipt of the DOJ letter, which is what they said in the justification. This is not something that was done solely in response to the DOJ letter, which was Ross's testimony before Congress. And I think what's important to note here is that we now know, in part because of the discovery order that the government challenges, that there were substantial discussions both internally at Commerce and between DOJ and Commerce preceding December 2017. The Secretary has admitted he began pursuing this question in February of 2017 after his appointment. We know that he had e-mail discussions and phone conversations with Chris Kobach and other outside stakeholders early in 2017 where they raised this question without any reference to the VRA. We know that his senior staff members tried to solicit. They were shopping around for a justification for this question in the middle of 2017. They reached out to DOJ, which rebuffed their request. They reached out to DHS, which rebuffed their request. And it wasn't until September when it was clear that all those efforts had panned out. Secretary Ross personally intervened, and John Gore entered into the picture from the Department of Justice. All of those facts were excluded from the initial administrative record. They are part of the Secretary's deliberation in this case. And what they highlight in particular— Go ahead. Finish it. Well, what I mean is what they highlight in particular is that the idea that the Secretary was responding because of a VRA enforcement rationale, there's at least a strong showing that that is pretextual. For months, Ross was operating off of some other rationale that did not involve the VRA and believed it so strongly that he was persistently badgering his staff. What was the other rationale? What was the other rationale on which he was operating? And where is that in the record? Well, I think we have two answers to that. One is we don't entirely know.  who was involved in this collaborative effort between Commerce and Justice is to determine what information was exchanged between them. And the second is we still don't know in part because we have yet to depose Secretary Ross, which is a battle I'm sure we'll have in a week or two. But that is the reason why discovery is important in this case. And what indication we have in the record is troubling. I referred to the communication with Chris Kobach that occurred early in 2017, well before DOJ's letter. The rationale that Kobach gave for adding a citizenship question was to exclude noncitizens from congressional reapportionment, which has been illegal for about 50 years at this point. And so it's, again, we don't know what basis there is, but because of the Secretary's concealment of the underlying rationale, because of the limited indications of his bases that we have in the record, again, as the district court found, there is concern that this dissembling is really concealing what would be improper purposes for adding the citizenship question. Okay. Mr. Weiner? Is it Weiner or Weiner? Weiner, Your Honor. Weiner? Sorry, I apologize. I've said that a lot. Hopefully your folks will forgive me. Go ahead. They will. Thank you, Your Honor, and may it please the Court. I'm one of the counsel for the NYIC plaintiffs, and I'd like to start off picking up on the question that Judge Pooler just asked, which is why do we think this happened? And, of course, in our complaint, we have alleged that one of the motivating factors here was animus directed towards minorities, immigrants of color, and based on national origin. And we submit that we are entitled to take discovery in order to determine if we can substantiate those allegations. If you look in the supplemental addendum, this was included in the supplemental administrative record, the basis for these allegations is there in black and white all the way back, right after Secretary Ross gets confirmed. What page? Where in the record? Sure. It's in the supplemental addendum that was filed with the NYIC brief on page 14 of the supplemental addendum. This is email traffic between Secretary Ross and one of his political advisors, Earl Comstock. And Mr. Comstock is forwarding to him an article. Page again. I apologize. Sorry. Sure, Your Honor. It's supplemental addendum 14. Okay. Thank you. And he's forwarding a Wall Street Journal article talking about the census and about the fact that noncitizens, in the words of Mr. Comstock in this article, are undocumented residents, aliens in the 50 states included in the apportionment population counts. Yes, all people are counted. And what happens, the sequence of events, is that this gets raised, Secretary Ross is aware of it, there are communications between Secretary Ross, the White House, and in particular the President's then Chief Political Strategist, Mr. Bannon, who connects Secretary Ross and Chris Kobach, then the Kansas Secretary of State. Later in the sequence, Mr. Kobach actually forwards an email to Secretary Ross that proposes a citizenship question, includes proposed language, and the transmittal email includes the discussion about the fact that the census is counting noncitizens and that that factors into apportionment. Your Honor, to your question. But the apportionment problem arises from the use of the census, not from asking the question. The question's been asked before on a number of decennial censuses. So it used to be, so from 1950 until 2000, it was on the so-called long-form census, which only went to a subset of the population. And the allegations that Specifically significant subsets such that you could make projections about Sure, but as Your Honor noted before, I think it was you, I apologize, the scientists, the experts at the Census Bureau, the ones who actually evaluated this, have said that adding the question back to the decennial census, the one that goes to every U.S. citizen, will materially harm the results that you get from the census. This is Supplemental Addendum 1, again, attached to the NYIC brief. And it's this amazing memo that the chief scientist, Dr. Abowd, at the Census Bureau writes, evaluating the request from the Department of Justice. And what Dr. Abowd says is we have a number of different ways that we can go about resolving the DOJ inquiry. And what he says is the absolute worst way to do it, to get the census block data that DOJ supposedly needs, well, the worst way to do it is by adding a citizenship question to the decennial census. And what the Census Bureau says is if you really want this information, there are other ways we can do it. We have administrative records that we can look at, and we can pull that information. And the amazing part here is that the staff at the Census Bureau, they reach out to the Department of Justice, and they say, folks, if you really want this information, why don't we set up a meeting, and we can talk about ways that the Census Bureau can get this for you. And you know what happens? John Gore shuts down the meeting. He says, nope, we're not meeting, and he plows ahead. They plow ahead with making the request, this DOJ request, that we now know was the result of back-channeling that was kept originally out of the administrative record, that was hidden from the public, hidden from Congress until the supplemental memorandum was issued weeks after these initial lawsuits are finally filed. Counsel, was this material that you cite us to, was this in the administrative record, or is it only before us because it's attached to your brief? So, Your Honor, I believe this material all came out as part of the supplemental administrative record. So, in other words, after this litigation started, the government was directed to submit the administrative record by Judge Furman. They did that. I think they produced about 1,330 pages or so. And then after the – Four hundred or something. Right. And then at the July 3rd hearing, Judge Furman ordered that the administrative record had to be supplemented. He, again, issued very detailed findings noting the amazing absence of any documentation, any information from before December 2017. He noted the absence of documentation to support conversations, data, and other facts that are referenced in the Ross Memorandum. And the administrative record subsequently was supplemented by the defendants. And the documents that we're talking about here, I believe, all come principally from that supplementation. We also know, Your Honor, we also – Yes, I – Hang on. Sorry, sorry. No, I just said thank you. What we also know, Your Honor, is that in this process of trying to find a rationale to support Secretary Ross's decision, we know, if you look in the supplemental addendum again, and I think this is 31, in May of 2017, Secretary Ross is asking his subordinates, he's asking, I'm mystified why nothing has been done in response to my months-old request that we include the citizenship question. So in May of 2017, Secretary Ross already has this idea that he wants the citizenship question in the decennial census. That certainly doesn't sound at all like they're just toying around a couple of different ideas and they're going to wait and see what the facts show. And further compounding this, if you look in the last page of the supplemental addendum, this is from the deposition transcript of Earl Comstock. He is the very senior advisor who's part of that email traffic that I just mentioned on supplemental addendum 31. And what Mr. Comstock testifies to in his deposition is that the way that he approached this task is that he got an instruction, and then what he says is you go forward, you find a legal rationale. This is not the way the administrative process is supposed to work. So the notion that the defendants put forward that as long as Secretary Ross believed what he was doing, that that ends the APA review, that is simply, number one, wrong as a matter of APA law. But moreover, even if we accept what they're proposing, even if we accept their test, we meet that test here. He didn't believe what he was saying. The record shows that this was all made up well in advance. And we submit at this point in time all we're asking is the right to conduct that extra record discovery in order to determine whether we're right or not. Judge Furman has treated this case incredibly carefully. He's been moving incrementally, step by step, making sure to keep the plaintiffs within the bounds of what is permissible discovery. He didn't open the door to standard Rule 26 discovery. He limited the number of depositions. He barred us from taking any third-party discovery other than from the Department of Justice. He has denied several of our motions to compel. He has affirmed a number of the defendants' invocations of deliberative process and other privileges here. So Secretary ‑‑ so Judge Furman has handled this case very carefully. This is not a situation where you have a judge that is so out of control that you cannot wait for final judgment such that mandamus would be appropriate. The petition should be not denied. Thank you, Your Honors. Mr. McArthur. Thank you. Just a few quick points, Your Honors. First, Judge Wesley, you had asked for citations of the record showing the discussions between the Department of Commerce and Justice. You can see those beginning at the government respondent's appendix, page 8. Eight? Page 8. Thank you. First point, there are no misrepresentations and no concealment. And to be clear, the basis for these various serious allegations is the simple fact that in Secretary Ross's original decision memo, he began his recitation of the events with the Department of Justice's formal request letter. There is nothing improper, nothing misleading about that. This process unfolded in two stages. There was an informal process of intra and interagency deliberation and consultation that was followed by a formal process that was kicked off when DOJ sent a formal request letter and Secretary Ross initiated a formal review led by the Census Bureau. There is nothing misleading about beginning that recitation of events with the formal letter. Counsel. Yes, Your Honor. Counsel, what I continue to find troubling is that Commissioner Ross says he was doing this to help enforce the VRA, and yet all the evidence supplied by the Census Bureau and other departments is that it would have the exact counter effect, that it wouldn't help enforcement, that what it would do is depress response rate. Can you speak to that? I can. He disagreed with that on the merits because he found a lack of empirical support. I do think that is a merits issue and not a discovery issue. There has been no finding made by the district court. It goes to the bad faith. The district court never found that Secretary Ross did not actually believe that reinstating this question would help the department enforce the VRA, and the district court never found that Secretary Ross acted on the basis of impermissible motive. The district court focused on the fact that Secretary Ross, it's clear from the record, wanted to add a citizenship question to the census even before he reached out to the Department of Justice, but there is nothing improper or nefarious about that. Agency officials, like the rest of us, are human beings. They come to their jobs with preexisting views and inclinations and dispositions. They are not blank slates. That is why you make promises. The question is whether they can keep them or not. That is why, Your Honors, that the Tenth Circuit held in the Jaggers case that we've cited that it is not bad faith to reach a favored result after finding a valid basis supporting it. They have no answer to that case. They say, number one, that it's not binding. They don't explain why it's wrong. They say, number two, well, that doesn't deal with discovery. It deals directly with what constitutes bad faith and pretext. Counsel, there was no valid basis to support this view that the Secretary held before he started getting information. There was no valid basis to support his view. That's just what you said. What's the valid basis? Everyone said don't do it. I did not say that he did not have a valid basis. I said that he had a preexisting inclination to want to go in this direction. For all we know, that may have been just based on the fact that he thought having this sort of information would be useful for policymakers and social scientists. But ultimately, he decided the rationale on which he wanted to rest his decision was the VRA enforcement rationale. And there has been no showing here, let alone a strong showing, that that was insincere or not believed. And that should be the end of the matter for the purposes of this inquiry into whether there has been a strong showing of bad faith and impermissible motive. Would you say that should the district court have examined the legitimacy in the sense of the provability of the DOJ justification? The district court did examine that, Your Honor. The district court said this was the fourth of the factors that the district court relied upon. He said that to his knowledge, the Department of Justice had never previously suggested that citizenship data could be useful in enforcing the VRA, and that is simply factually incorrect. It ignores the fact that for 30 years, from 1970 to 2000, DOJ used citizenship data from the long-form decennial census to enforce the VRA. That's at addendum page 180. It's page 2 of the Department of Justice's letter. In fact, the 2010 redistricting cycle was the first ever in which the ACS data was the only source of citizenship data. Finally, Your Honors, on this, the arguments that we heard from Mr. Wiener about the equal protection claim, I think there are a couple of points to emphasize. One, the district court expressly declined to rely on the equal protection claim as a basis for extra record discovery here. Number two, that claim is subject to the same APA record review rules as other APA claims, including other APA claims where the decision-maker's intent is relevant, such as prejudgment or personal bias. The district court made no finding, and none is remotely supportable, on this record that Secretary Ross acted on the basis of any impermissible animus.